IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN LEE HARTMAN, | : | Civil No. 1:22-CV-1408 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **(Magistrate Judge Bloom)** |
| KILOLO KIJAKAZI, | : | |
| Acting Commissioner | : | |
| of Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.  Introduction

Brian Hartman filed an application for disability and disability insurance benefits on February 25, 2015. Following an initial hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Hartman was not disabled from his amended onset date of disability of February 25, 2015, through September 30, 2016, the date Hartman was last insured. This decision was remanded for consideration by a properly appointed ALJ, and after a second administrative hearing, a different ALJ also determined that Hartman was not disabled from his amended onset date of July 21, 2014, through September 30, 2016.

Hartman now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supported the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.  Statement of Facts and of the Case

Brian Hartman filed for disability and disability insurance benefits, alleging disability due to manic depression, anxiety, and attention deficit disorder ("ADD"). (Tr. 83). He alleged an onset date of disability of September 12, 2012, which was later amended to an onset date of July 21, 2014. (Tr. 83, 917). Hartman was 34 years old at the time he was last insured, had at least a high school education, and had past relevant work as a registration clerk, material handler, customer service clerk, and cashier. (Tr. 927).

The medical record regarding Hartman's impairments revealed that Hartman suffered from depression and anxiety during the relevant period. Hartman presented to the Columbia County Volunteers Clinic in July of 2014. (Tr. 211). He reported always feeling anxious, although some days were worse than others, as well as thoughts of worthlessness and guilt. (*Id*.). He further reported crying spells and a prior suicide attempt in 2005. (*Id*.). On examination, he was anxious with moderate psychomotor agitation; intact orientation, memory, insight, and judgment; and possible depression associated hallucination, although it was noted that this "may be imagined." (Tr. 212). He was started on Zoloft and referred to therapy. (Tr. 213).

Around this time, Hartman was seen for a psychiatric evaluation by Dr. Robert Gerstman, D.O. (Tr. 230-31). Hartman reported isolating himself and having dark thoughts, as well as the death of his grandmother as a recent stressor. (Tr. 230). It was noted that Hartman had not had prior inpatient mental health treatment and was getting his prescriptions from his primary care physician. (*Id*.). A mental status examination revealed that Hartman was cooperative with a sad mood,

3

restricted affect, goal directed thought processes, no hallucinations or suicidal ideations, and good insight and judgment. (Tr. 230-31). Dr. Gerstman diagnosed him with dysthymia and directed Hartman to follow up in two months. (Tr. 231). In August of 2014, Hartman was seen at the Columbia County Clinic, where it was noted that his anxiety had not significantly improved. (Tr. 217). While his mood was mildly dysthymic and anxious, a mental status examination was otherwise unremarkable. (Tr. 219).

At a visit with Dr. Gerstman in October of 2014, Hartman reported that he was not feeling much better. (Tr. 229). He presented with an anxious mood and restricted affect, fair insight and judgment, and his cognition was grossly intact. (*Id.*). Dr. Gerstman increased his Zoloft prescription. (*Id.*). In December, Hartman began treating with Jay Johnson, LCSW, for his depression and anxiety. (Tr. 273). He reported that his sleep was "ok," but his energy was poor. (*Id.*). On examination, Hartman had an anxious mood and affect, normal speech and thought processes, no suicidal ideations or hallucinations, and fair insight and judgment. (Tr. 274-75). At a follow up appointment later that month,

4

Hartman reported a little decrease in his anxiety levels, and his mental status examination was largely unremarkable other than a depressed mood and affect. (Tr. 269).

Johnson's treatment notes from January of 2015 indicate that Hartman reported feeling "good," and that he had an "unstressful" week. (Tr. 263). Hartman's mood was stable and euthymic, and Johnson indicated a "marked reduction in anxiety." (*Id.*). However, in February of 2015, Dr. Gerstman noted that Hartman had taken a day's worth of pills at once on two occasions but had not told anyone. (Tr. 228). Hartman reported that his depression was on and off. (*Id.*). On examination, he had a dysthymic mood and affect, but otherwise had normal speech, goal directed thought processes, grossly intact cognition, fair insight and judgment, and no suicidal ideations. (*Id.*). Dr. Gerstman lowered his dosage of Zoloft and increased his Klonopin. (*Id.*). In March, Johnson noted no change from Hartman's previous session, and that Hartman seemed "stuck." (Tr. 252).

In April of 2015, Hartman reported that things were not going well, and referenced the "dark man" thoughts in his head. (Tr. 246). Hartman

reported increased anxiety at the following therapy appointment. (Tr. 244). He had an anxious and depressed mood, limited insight and judgment, and normal speech and thought processes. (*Id.*). The next day, Hartman presented to the emergency room after overdosing on his medication, stating that he was trying to end his life. (Tr. 233). A psychiatric consultation and a mental status evaluation revealed an anxious mood, slurred speech, impaired attention and concentration, and poor insight and judgment. (Tr. 241).

Around this same time, Dr. Lewis filled out a medical source statement for Hartman, in which he opined that Hartman had fair to no ability to make occupational adjustments due to his severe depression and multiple suicide attempts. (Tr. 324). He further opined that Hartman would be absent from work 2 to 4 times per month. (Tr. 326). Dr. Lewis based this opinion on Hartman's history of severe depression and suicide attempts resulting in hospital admissions. (Tr. 325-26). Following Hartman's discharge from the hospital, Johnson's treatment notes indicate that Hartman was doing well and reported no major depressive issues since being released. (Tr. 448). On examination, Hartman had a

euthymic mood, normal thought processes, grossly intact cognition, and good insight and judgment. (*Id.*).

Therapy treatment notes from June of 2015 showed that Hartman reported feeling "down," and that he had financial stressors because his roommate was out of work. (Tr. 475). He had a mildly depressed and anxious mood, but an otherwise unremarkable mental status evaluation. (*Id.*). At a visit with Dr. Lewis around this time, Hartman reported some ongoing depression and increased anxiety but denied any further auditory hallucinations. (Tr. 465). Later in June, Hartman underwent a consultative psychiatric evaluation with Dr. Elaine Altoe, Psy.D. (Tr. 333-40). Hartman reported his hospital admission from April of 2015, and that he had difficulties sleeping. (Tr. 333-34). He further stated that he experienced crying spells and panic attacks, as well as auditory hallucinations when he was "very depressed." (Tr. 334). A mental status examination revealed coherent and goal directed thought processes; neutral mood; anxious affect; intact attention, concentration, and memory; and fair insight and judgment. (Tr. 335-36). Hartman reported being able to care for himself, perform housework, go shopping and

manage his own money. (Tr. 336). Based on her assessment, Dr. Altoe opined that Hartman had no limitations in understanding, remembering, and carrying out instructions; moderate limitations in interacting appropriately with others; and marked limitations in responding appropriately to usual work situations and changes in a routine work setting. (Tr. 338-39).

In July, Hartman reported increased depression and feelings of sadness, as it was the anniversary of his grandmother's passing. (Tr. 494). Around this time, Dr. Lewis filled out another medical source statement, opining that Hartman had fair to no ability to make occupational adjustments, performance adjustments, or personal-social adjustments. (Tr. 341-42). Dr. Lewis noted Hartman's suicide attempts and his "dark man" hallucinations and opined that Hartman would be absent more than four times per month and would need unscheduled breaks every two hours or more. (Tr. 342-43).  In August and September, Hartman indicated some passive suicidal ideations but no plan. (Tr. 512). However, later in September, Hartman again overdosed on his medications, resulting in a hospital admission. (Tr. 344, 552). Following

his discharge, he reported to Johnson that he was feeling better, and that his medicine was now in a lock box controlled by his roommate. (*Id.*). Treatment notes indicate another hospital admission in October from an overdose. (Tr. 355, 598).

Therapy notes from November indicate that Hartman had successfully applied for and interviewed for a job but had a panic attack the night before he was supposed to start, which resulted in him turning down the job. (Tr. 622). Two days later at a follow up with Dr. Lewis, Hartman reported doing "ok" overall. (Tr. 630). December treatment notes indicate that Hartman's mood had been good, although he had some increased anxiety. (Tr. 654, 678, 685).

Beginning in January of 2016, Hartman's treatment notes consistently noted mild depression but an overall good mood, as well as unremarkable mental status examinations. (Tr. 693, 709, 717, 725). In March, Hartman reported one episode of the "dark man" returning, but treatment notes showed that he was able to respond better. (Tr. 748). Dr. Lewis noted that Hartman's mood was much better and that he was "doing overall well." (Tr. 780). Throughout the remainder of the relevant

9

time, Hartman's treatment notes consistently noted stability and even improvement in his anxiety and depression. (Tr. 792, 800, 808, 834, 858, 866).

After the relevant period, Hartman continued to treat with his providers.[1] In December of 2016, Dr. Lewis noted that Hartman's depression was "overall stable." (Tr. 875). Johnson's treatment notes for January and February of 2017, indicate that Hartman's mood was stable, and he had unremarkable mental status evaluations. (Tr. 1504-05). However, in March of 2017, Dr. Gerstman wrote a "To Whom It May Concern" letter recommending that Hartman receive disability because his "stress is reduced by not being forced to work and be with strangers[.]" (Tr. 347).  Dr. Lewis also wrote a letter several days later, opining that Hartman was "permanently disabled." (Tr. 349). Three years after the relevant period in September of 2019, Johnson filled out a medical source

---

[1] The administrative record in this case spans over 2000 pages and contains many additional records of Hartman's treatment between 2018 and 2021. (Tr. 1105-1414; 1881-2354). While we have reviewed these records, these records fall substantially outside of the relevant time period and are not relevant to our review of the ALJ's decision, which contemplates the time period between July of 2014 and September of 2016.

10

statement, which opined that Hartman had several marked to extreme limitations in his abilities to do unskilled work, and that he would be absent more than three times per month. (Tr. 2078-79). Johnson appeared to base this opinion on Hartman's history of chronic depression and social anxiety. (*Id.*).

Thus, it was against the backdrop of this record that an ALJ held a hearing on Hartman's disability application on March 2, 2021.[2] (Tr. 935-83). Hartman and a Vocational Expert both appeared and testified at this hearing. (*Id.*). Following this hearing, on June 16, 2021, the ALJ issued a decision denying Hartman's application for disability benefits. (Tr. 916-29). The ALJ first concluded that Hartman had not engaged in substantial gainful activity for the period between July 21, 2014, and September 30, 2016. (Tr. 920). At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Hartman suffered from the following severe impairments: major depressive disorder, dysthymia, attention deficit disorder, and anxiety disorder. (*Id.*). At Step 3, the ALJ

---

[2] This was the second hearing held by a new ALJ after the case was remanded from the District Court due to an Appointments Clause issue. (Tr. 989-97).

concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 920-22). Specifically, the ALJ found that Hartman suffered from only mild to moderate limitations in the four areas of social functioning. (*Id.*). The ALJ further found that the medical evidence failed to establish the presence of the "paragraph C" criteria. (*Id.*).

Between Steps 3 and 4, the ALJ then concluded that Hartman:

[H]a[d] the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform jobs that take no more than 30 days of training to learn with a specific vocational preparation level of two or less and which are generally classified as unskilled. He can perform jobs that are considered "low stress" in that they involve only occasional, simple decision making, and only occasional, gradual changes in the work duties and work setting. The claimant can have occasional interaction with co-workers and supervisors, but he is limited to rare or incidental contact with customers or members of the general public.

(Tr. 922).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Hartman's reported symptoms. The ALJ first considered the July 2015 opinion of the state agency consulting physician, Dr. Melissa Diorio,

Psy.D., and gave this opinion great weight. (Tr. 925). Dr. Diorio reviewed the medical record and found that Hartman had mild to moderate limitations in the four areas of social functioning. (Tr. 88). Dr. Diorio opined that Hartman was capable of working within a work schedule at a consistent pace; that he could make simple decisions, as well as carry out short, simple instructions; and that he could maintain regular attendance and be punctual. (Tr. 90). She further opined that Hartman's social skills and activities of daily living were functional, and he was able to maintain socially appropriate behavior. (Tr. 91). Dr. Diorio considered Dr. Altoe's June 2015 consultative examination and opined that Dr. Altoe's opinion was only partially consistent with her assessment, and that Dr. Altoe's limitations regarding occupational adjustments were not consistent with the overall medical record. (*Id.*).

The ALJ found that Dr. Diorio's opinion was consistent with the overall medical record for the relevant period. (Tr. 925). The ALJ reasoned that Dr. Diorio's mild to moderate limitations were consistent with Dr. Gerstman's examination findings during the relevant time, which included a less dysthymic mood, no hallucinations, and fair insight

and judgment. (*Id.*). The ALJ also found that Dr. Diorio considered Hartman's mental health hospitalizations when she included moderate limitations in the "paragraph B" criteria. (*Id.*).

The ALJ also considered the September 2019 medical source statement of Jay Johnson, Hartman's treating therapist, and gave this opinion little weight. (Tr. 925). The ALJ gave this opinion little weight because Johnson's opinion was rendered three years after Hartman's last insured date, and under the controlling regulations, Johnson was not an acceptable medical source.[3] (Tr. 925).

The ALJ considered the opinions of Dr. Lewis, Hartman's primary care physician, from 2015 and 2017 and gave these opinions little weight. Regarding Dr. Lewis' 2015 medical source statement, the ALJ gave this opinion partial weight, finding that Dr. Lewis' assessment concerning Hartman's fair ability to function in areas of occupational functioning was supported by the treatment records. (Tr. 926). However, the ALJ gave no weight to Dr. Lewis' opinion that Hartman would be absent 2 to

---

[3] Because Hartman's application was filed in February of 2015, the ALJ was required to assess the medical opinion evidence using the regulations in place prior to March of 2017.

14

4 times per month, as the ALJ reasoned that this limitation was not reflective of the entire period of alleged disability and rather was reflective only of the period in which Hartman had several hospitalizations. (*Id.*). The ALJ further considered Dr. Lewis' 2017 statement that Hartman was permanently disabled and gave this opinion limited weight. (Tr. 925-26). The ALJ reasoned that this opinion was rendered after the last insured date, it addressed an issue that is reserved to the Commissioner, and it was not supported by the treatment records during the relevant period. (*Id.*).

The ALJ also considered Dr. Altoe's June 2015 opinion and gave this opinion limited weight. (Tr. 926-27). The ALJ first noted that Dr. Altoe's opinion was rendered during the six-month period where Hartman had undergone several mental health hospital admissions. (*Id.*). The ALJ reasoned that the marked degree of limitation opined by Dr. Altoe may have been appropriate during that hospitalization period but was not reflective of the overall record during the alleged disability period. (*Id.*).

15

Finally, the ALJ considered Dr. Gerstman's 2017 statement that Hartman should receive disability and that his condition was stable due to not being forced to work. (Tr. 926). The ALJ gave this opinion limited weight, citing Dr. Gerstman's treatment records that reflected Hartman's medications were working well, and that on the day of Dr. Gerstman's statement, Hartman had an unremarkable mental status examination. (*Id.*).

With respect to Hartman's symptoms, the ALJ found that Hartman's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence. (Tr. 922-25). Hartman testified that he lived with his boyfriend, and that he had no driver's license. (Tr. 956). He reported that his depression worsened in 2012, which coincided with some legal trouble he had at that time. (Tr. 961). He testified that his depression and anxiety caused him to experience crying spells and auditory hallucinations, and that he had attempted suicide three times. (*Id.*). Hartman stated that his medication treatment helped at times, but that his doctors had to tweak his regimen often. (Tr. 962-63, 970). He reported three mental health

hospitalizations in 2015, two of which were the result of his depression. (Tr. 963-64). He further stated that he sometimes experienced auditory hallucinations in the form of a "dark man" urging him to take his own life. (Tr. 967-68). Regarding his activities of daily living, Hartman testified that he was able to read books, watch television, and do some chores on good days. (Tr. 965). He also reported an ability to care for his personal hygiene. (Tr. 966-67).

The ALJ ultimately found Hartman's testimony to be inconsistent with the objective clinical findings. (Tr. 922-25). The ALJ recounted the medical evidence that showed many normal examination findings during the relevant period, such as appropriate behavior and orientation, lack of hallucinations, euthymic mood, good insight and judgment, and clear and linear thought processes. (Tr. 923-24). The ALJ noted Hartman's three hospitalizations in 2015, and further noted that Hartman had applied and interviewed successfully for a job in November of 2015, although he reported experiencing a panic attack that required him to then turn down the job. (Tr. 924). The ALJ highlighted the normal examination findings in the record from 2016, such as a euthymic mood, normal speech, lack of

17

hallucinations and suicidal thoughts, good orientation, and fair insight and judgment. (*Id*.). The ALJ further noted that Hartman was able to shop in stores with his boyfriend, visit friends, spend time online, and do housework. (Tr. 924-25).

Having made these findings, the ALJ found at Step 4 that Hartman was unable to perform his past work but found at Step 5 that Hartman could perform the occupations of a router, marker, and stock checker. (Tr. 29). Accordingly, the ALJ found that Hartman had not met the stringent standard prescribed for disability benefits and denied his claim. (Tr. 928-29).

This appeal followed. On appeal, Hartman presents several issues, contesting the ALJ's failure to find that Hartman met a listing, the ALJ's treatment of the medical opinion evidence and Hartman's testimony, and the hypothetical questions posed to the vocational expert. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III. <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial

evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v.*

*Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and

became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our

review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that

a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of

independent judgment based upon all the facts and evidence. *See Titterington,* 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The Commissioner's regulations also set standards for the evaluation of medical evidence and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). The ALJ is required to evaluate every medical opinion received, regardless of the source. 20 C.F.R. §404.1527(c).

For applications filed prior to March of 2017, an ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c) in deciding what weight to afford medical opinions and evidence. As ties between the source and the

claimant become weaker, "[t]he regulations provide progressively more rigorous tests for weighing opinions." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, thereby generally entitling their opinions to more weight. *See* 20 C.F.R. §404.1527(c)(2); 20 C.F.R. §404.1502 Under some circumstances, where the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other medical evidence, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188.

If no medical opinion is given controlling weight, the regulations direct the ALJ to consider several factors in deciding what weight to afford medical opinions, including: the nature and extent of the treatment relationship; the length of the treatment relationship and frequency of examination; whether the opinion is supported by and consistent with the relevant medical evidence in the record; whether the source is a specialist; and any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These factors also call for careful consideration of treating source opinions.

An ALJ may not reject a treating source's opinion and substitute the judge's own lay assessment of the record for that medical opinion. Instead, the ALJ typically may only discount a treating opinion when it conflicts with other objective tests or examination results. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may afford little weight to a treating opinion based on inconsistencies between the physician's opinion and his or her own treatment notes. *Torres v. Barnhart*, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, even where an opinion is well-supported by objective findings, it may not be entitled to controlling weight if it is nonetheless inconsistent with the claimant's activities. *Tilton v. Colvin*, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016). However, the ALJ's decision, including any judgments on the weight afforded to medical opinions, must ultimately be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter*, 642 F.2d at 704. Therefore, the failure of an ALJ to fully articulate his or her reasoning for rejecting a treating source opinion may compel a remand.

28

**D. Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

When evaluating lay testimony regarding a claimant's reported degree of pain and disability, the ALJ must make credibility determinations. *See Diaz v. Comm'r,* 577 F.3d 500, 506 (3d Cir. 2009). Our review of those determinations is deferential. *Id.* However, it is incumbent upon the ALJ to "specifically identify and explain what evidence he found not credible and why he found it not credible." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citations omitted). An ALJ should give great weight to a claimant's testimony "only when it is supported by competent medical evidence." *McKean v. Colvin*, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015) (citations omitted). As the Third Circuit has noted, while "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled").

The Social Security Rulings and Regulations provide a framework for evaluating the severity of a claimant's reported symptoms. 20 C.F.R.

§§ 404.1529, 416.929; SSR 16–3p. Thus, the ALJ must follow a two-step process: first, the ALJ must determine whether a medically determinable impairment could cause the symptoms alleged; and second, the ALJ must evaluate the alleged symptoms considering the entire administrative record. SSR 16-3p.

Symptoms such as pain or fatigue will be considered to affect a claimant's ability to perform work activities only if medical signs or laboratory findings establish the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this assessment, the ALJ must determine whether the claimant's statements regarding the intensity, persistence, or limiting effects of his or her symptoms are substantiated considering the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes, but is not limited to, medical signs and laboratory findings; diagnoses; medical opinions provided by treating or examining sources and other medical sources; and information regarding the claimant's

symptoms and how they affect his or her ability to work. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

The Social Security Administration recognizes that individuals may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations set forth seven factors that may be relevant to the assessment of the claimant's alleged symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: the claimant's daily activities; the "location, duration, frequency, and intensity" of the claimant's pain or symptoms; the type, dosage, and effectiveness of medications; treatment other than medications; and other factors regarding the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

E. **The ALJ's Decision is Supported by Substantial Evidence.**

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is

"only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154. Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Hartman argues that the ALJ erred when he found that Hartman did not meet Listing 12.04. Hartman contends that the record shows marked limitations in interacting with others; concentrating, persisting, and maintaining pace; adapting or managing himself; and that he has a history of at least two years of mental health treatment and marginal adjustment. This argument is intertwined with Hartman's contention that the ALJ erred in the weight afforded to Hartman's treating sources—he asserts that if the ALJ afforded proper weight to the treating source opinions, he would have found marked limitations in these areas of functioning and marginal adjustment, rendering him *per se* disabled under the listing. Hartman further contends that the ALJ discounted his testimony, which also reflected a more restrictive level of impairment. Finally, Hartman argues that the ALJ failed to include certain restrictions in his hypothetical questions to the vocational expert.

Hartman's arguments regarding the opinion evidence in this case center largely around the notion that because he had opinions from treating sources, these opinions should have been given controlling or great weight. He focuses primarily on the opinions of Dr. Gerstman, his treating psychiatrist; Dr. Lewis, his primary care physician; Jay Johnson, his treating therapist; and Dr. Altoe, the consultative examiner. He contends that the ALJ erred when affording these opinions little or partial weight, and instead afforded Dr. Diorio's opinion great weight.

As we have explained, under the controlling regulations, a treating source opinion may be entitled to great or even controlling weight if that opinion is supported by the record. *See* 20 C.F.R. §§04.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188. However, if a treating source opinion is contradicted by other evidence in the record, an ALJ is not required to give the opinion controlling weight. *Johnson*, 529 F.3d at 202–03; *Torres*, 139 F. App'x at 415. Ultimately, the ALJ must adequately explain his reasoning for the weight afforded to the medical opinion evidence. *Cotter*, 642 F.2d at 704.

After review, we conclude that the ALJ's treatment of these medical opinions is supported by substantial evidence. In the instant case, the ALJ was confronted by several medical opinions, some of which were highly restrictive. The ALJ considered the opinions of Dr. Gerstman and Dr. Lewis, which recommended that Hartman receive disability and opined that he was permanently disabled and concluded that these opinions were inconsistent with the treatment records during the relevant period. While the ALJ recognized the abnormal findings in the record, he specifically noted these physicians' own findings during the relevant period of a euthymic or stable mood, goal directed and coherent thought processes, and good insight and judgment. The ALJ further concluded that while these sources opined that Hartman was disabled, the issue of disability is reserved for the Commissioner. Additionally, with respect to Dr. Lewis' 2015 opinion, the ALJ reasoned that Dr. Lewis' restrictions may have been adequate during Hartman's periods of hospitalization, but that the extreme restrictions were not indicative of the entire disability period.

With respect to Johnson's opinion, the ALJ found that this opinion was not rendered by an acceptable medical source and was rendered three years past the date last insured. However, it is clear from a review of the decision that the ALJ considered Johnson's treatment notes, which included both normal and abnormal examination findings during the relevant period. Accordingly, the ALJ was entitled to afford this opinion little weight. *See e.g.*, *Dietrich v. Saul*, 501 F. Supp. 3d 283, 292-93 (M.D. Pa. 2020) (collecting cases) (finding no error in the ALJ's decision to afford little weight to an opinion rendered a significant length of time after the date last insured).

Additionally, while Hartman contends that the ALJ should have afforded more weight to the examining source, Dr. Altoe, rather than the consulting source, Dr. Diorio, the ALJ adequately explained the weight afforded to these respective opinions. While Dr. Altoe examined Hartman, the ALJ concluded that her restrictive opinion regarding Hartman's ability to respond to work situations and changes in the work setting was not supported by the entire record. The ALJ reasoned that this opinion, which was rendered during the time that Hartman was

hospitalized several times, "may be appropriate during periods of decompensation[,]" but was "not reflective of the claimant's mental functioning during the entire period[] in question." (Tr. 927). As the ALJ recounted throughout the opinion and as recounted above, treatment notes during the relevant time showed that Hartman's mood was stable and euthymic at times despite his depression and anxiety, his thought processes were intact, and his cognitions was grossly intact. Accordingly, the ALJ afforded more weight to Dr. Diorio's opinion, which considered Hartman's hospitalizations as well as Dr. Altoe's opinion, but ultimately found that the treatment notes during the relevant period limited Hartman to no more than mild to moderate limitations in the areas of functioning.

Thus, the ALJ in this case was faced with competing medical opinions, all with varying levels of restrictions regarding Hartman's mental functioning. The ALJ considered each opinion and explained the weight afforded to each, citing specific evidence from the relevant disability period that either supported or contradicted each opinion. Accordingly, we conclude that the ALJ adequately explained the weight

afforded to these opinions, and substantial evidence supports his treatment of the opinion evidence in this case.

We reach a similar conclusion with respect to the ALJ's treatment of Hartman's testimony. While Hartman argues that the ALJ failed to consider his hearing testimony in the unfavorable decision, it is clear that the ALJ did consider Hartman's testimony but found it to be inconsistent with the medical record. For example, the ALJ recounted Hartman's testimony that he had difficulty sleeping, but pointed to evidence in the record indicating that Hartman was sleeping 7 hours per night. (Tr. 923). While Hartman reported an inability to go out in public and be around strangers, the ALJ noted that Hartman was able to shop in stores with his boyfriend, as well as visit with family and friends, and that he applied for, was interviewed for and hired for a job during the relevant time. (Tr. 924-25). The ALJ further pointed to evidence in the record that showed Hartman's reported symptoms coincided with certain stressors in his life, such as financial hardships and deaths in his family. (*Id.*). Thus, we conclude that the ALJ's treatment of Hartman's testimony is supported by substantial evidence.

37

Finally, because we have concluded that the ALJ's treatment of the opinion evidence and Hartman's testimony is supported by substantial evidence, Hartman's arguments concerning the listings and the hypotheticals to the vocational expert are unavailing. It is well established that the Third Circuit "does not require an ALJ to submit to the [VE] every impairment *alleged* by a claimant[,]" but rather "is only required to submit credibly established limitations." *Zirnsak*, 777 F.3d at 615 (citations and quotation marks omitted). Here, the ALJ explained why he discounted the marked limitations contained in some of the medical opinions, and accordingly, was not required to submit those limitations to the vocational expert for consideration. Nor was he required to find that these limitations were present in the context of Listing 12.04. Rather, as we have explained, the ALJ properly explained why he discounted these limitations, citing to evidence in the record contradicting such limitations. Accordingly, we find no error in the ALJ's hypothetical questions to the vocation expert or in the ALJ's consideration of Listing 12.04.

Although the record in this case contained abnormal findings during the relevant period, such as notes documenting Hartman's subjective complaints of his anxiety and depression, as well as episodes of Hartman's severe depression resulting in hospitalization, we are not permitted at this stage to reweigh the evidence, *Chandler*, 667 F.3d at 359, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence." *Biestek*, 139 S. Ct. at 1154. Given that the ALJ considered all the evidence and adequately explained his decision for including or discounting certain limitations as established by the evidence, we find no error with the decision. Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

## IV.   Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

39

Submitted this 10th day of January 2024.

_s/ Daryl F. Bloom_
Daryl F. Bloom
United States Magistrate Judge